*573
 
 Nash, J.
 

 The action is in case, brought to recover from the defendant, who was the plaintiff’s overseer, damages for the loss of a negro man, by the name of Israel, upon the allegation, that the defendant negligently and wrongfully employed the negro upon business, not belonging to the plaintiff’s concerns, which was dangerous in its nature, and whereby Israel lost his life. The plaintiff owned three fields on the Cape Fear River — two on the west side and one on the east. The defendant was his overseer, and Israel a hand uuder him. The lower field on the west side of-the fiver was called “Pemberton,” below which the defendant and the negroes lived; and the upper field was called “The Point,” and lay opposite the field on the east side. On the day before the accident occurred, the defendant, with Israel and other hands, was employed in floating logs out of the field on the east side of the river into the current, that by it they might be carried off, there being at the time a very large freshet in the river, spreading over the low grounds and cultivated fields. Late in the evening, the defendant went down the river in a boat with Israel, stopt a while at a raft belonging to a man named Nardin, and then proceeded down the river to where he and the slave resided. The next morning the defendant came up the river in his canoe with Israel, and, after a short stoppage at Nardin’s raff} proceeded on his way to his business in floating off logs. Nardin went with them to where their business lay, and after working nearly all day, the defendant, still attended by Israel, came down to a raft belonging to a man named Cameron, where he got out of the boat, and directed Israel to carry Nardin, who was with them, to his own raft and then return for him. When Israel left Nardin’s raft, he crossed directly over to the other side of the river, where the boat got entangled among the bushes, was up. ' set, and Israel was drowned. Israel was about forty -years of age, a stout, active man, a good waterman, and
 
 *574
 
 Understood the management of boats and canoes, and was acquainted with the river. This was proved by a witness for the plaintiff, who further stated, that he did not consider that there was any danger, in the main current of the river, to boats or canoes After Israel was drowned, the other hands, who had been employed in floating off the 'Jogs, came down the river«n the course that the defen* d,ant had pursued in coning down. The case further states, that the usual course and the safest in getting from the dwelling of the defendant to the field on the east side, when a fresh was in the river, was through the low grounds of the Pemberton and Point fields toa spot oppo site to the field on the east side. The case does not tell us distinctly on which side of the river the raft ofNar-din was moored. We presume, however, that it was on the west side, as it is stated to have been a little above where the defendant lived.
 

 The counsel for the plaintifFmoved the Court to charge the jury, that the defendant had been guilty of gross negligence, which made him liable to the plaintiff’s recovery. This was declined ; and the jury were instructed, that it was the duty of the defendant to take the same care of the plaintiff’s property under his control, that a man of ordinary prudence takes of his own ; and, if they believed he had not taken such care, or that he had not taken care, or that he had placed the slave in a dangerous situation, not in[his owner’s business and employment, and the loss of the slave, was from want of proper care or from unnecessary exposure to danger, it was gross negligence and the plaintiff was entitled to recover.
 

 The jury found a verdict for the defendant and the plaintiff' appealed.
 

 We can see in the instuctions given no error, of which the plaintiff has a right to complain. In the argument, the case was treated as one of strict bailment, and the instruction asked for placed it upon that ground. An
 
 *575
 
 overseer is not strictly a bailee, though many of the principles of that relation and many of its duties attach to him. It is his duty to take such care of the property entrusted to him, as a man of ordinary prudence would take of his own property. The Court could not give the instruction asked for — the case discloses no such gross negligence. The Court then instructed the jury what would amount to gross negligence. Was there error in this charge
 
 1
 
 We repeat, none, of which the plaintiff has a right to complain. The defendant, after spending as much time in floating off logs from the field on the east-side of the river, as he thought was prudent and safe, left on his way to his residence on the opposite side of the river. He was obliged to cross the river to effect his purpose. Pursuing his ordinary course, he stopt at aneigh-hor’s raft, and directed Israel to put Nardin on hi4 raft about two hundred yards belowand thentoreturn for him. That he was in his ordinary course in returning home, is shown by his pursuing the same course the night before, and from the fact, that the other negroes in their boats followed in the same direction. Israel was not a boy, ignorant of boating, nor a feeble man, but hale and strong, living upon the river, skilful in boating and accustomed to managing boats and canoes; and the witness of the plaintiff stated, there was no danger in the body of the stream. To return from Nardin’s raft to Cameron’s did not require the negro to cross the river, both rafts being on the same side, and, where he left, about a hundred yards apart. Why he did cross it is not stated, and cannot now be known. We cannot perceive of what negligence the defendant was'guilty, and think his Honor would have been justified in telling the jury, there was no evidence of any negligence.
 

 Per Curiam-. Judgment allinnc-d»